UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALL GLASS S.R.L.,

                        Plaintiff,

-v-

ARGLASS YAMAMURA SE, LLC,

                        Defendant.

Civil Action No: 22-cv-7863 (MKV)

**AMENDED ANSWER & COUNTERCLAIMS**

Defendant-Counterclaim Plaintiff Arglass Yamamura SE, LLC ("Defendant," or "Arglass"), by and through its attorneys, responds to the Complaint brought by Plaintiff-Counterclaim-Defendant All Glass s.r.l. ("Plaintiff" or "All Glass") as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Arglass lacks sufficient information to form a belief as to the truth of this allegation.

2. Admitted except the principal place of business is 1 Arglass Rd., Valdosta, GA, 31601.

3. Admitted. Specifically, diversity jurisdiction is proper pursuant to 28 U.S.C. 1332(a)(B).

4. Admitted that Arglass consented to a forum selection clause in New York courts and that New York is the place of fulfillment pursuant to the contract, but denied that Arglass's principal place of business is in New York.

**FACTUAL ALLEGATIONS**

5. Denied.

6. Denied as stated but admit that All Glass purports to do this kind of work.

7. Admitted that an offer was sent but denied that this paragraph states the full content of the contract.

8. Admitted that there was an offer and contract but denied that All Glass has attached a true and correct copy of all the contractual terms. Arglass executed the contract or about August 12, 2019. A further set of contractual documents is set forth at **Exhibit 1** to Arglass's Answer and Counterclaim.

9. Admitted that there was an offer and contract but denied that All Glass has attached a true and correct copy of all the contractual terms. Arglass executed the contract or about August 12, 2019. A further set of contractual documents is set forth at Exhibit 1 to Arglass's Answer and Counterclaim.

10. Admitted but denied that the full set of documents was appended to the Complaint and refer to Exhibit 1 of the Answer and Counterclaims for further contractual documents.

11. Admitted but denied that the full set of documents was appended to the Complaint and refer to Exhibit 1 of the Answer and Counterclaims for further contractual documents.

12. Admitted that the parties executed an amendment on February 20, 2020 which increased the price to $9,107,000. All Glass's claims regarding the reason for the amendment are denied.

13. Admitted.

14. Denied. All Glass has failed to perform numerous material contractual obligations and has repeatedly failed to cure its defaults under the Agreement as fully pled in the Counterclaim.

15. Admitted that the Valdosta, Georgia plant has produced some glass containers since December 2020 but denied that it is "as a result of All Glass' performance" and denied that the plant has performed at the level required by the Agreement.

16. Denied.

17. Admitted that Arglass has paid $5,464,200, but denied that All Glass is or was entitled to any amount of payment given its fundamental failure of performance.

18. Denied.

19. This allegation constitutes a legal conclusion for which no response is required. To the extent a response is required, denied.

20. Denied.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract)

21. No response is required.

22. Admitted except refer to Exhibit 1 of the Answer and Counterclaims for further contractual documents not included in Plaintiff's submission.

23. Denied.

24. Denied.

25. Admitted that Arglass has paid $5,464,200, but denied that All Glass is or was entitled to any amount of payment given its fundamental failure of performance.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

## AS AND FOR A SECOND CAUSE OF ACTION
(Copyright Infringement)

30. No response is required.

31. Denied.

32. This allegation constitutes a legal conclusion for which no response is required. To the extent a response is required, denied.

33. Denied.

34. Denied.

35. Denied. Refer to the Agreement for its terms which are not accurately set out in this allegation.

36. Denied, except Arglass lacks sufficient knowledge or information to form a belief as to the truth of the allegation regarding a letter sent to third parties.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

## AFFIRMATIVE DEFENSES[1]

### First Affirmative Defense (Failure to State a Claim)

All Glass fails to state a claim because, *inter alia*, All Glass has not adequately alleged that it has performed its obligations under the contract, and has failed to adequately allege multiple elements of its copyright claim, including infringement.

### Second Affirmative Defense (Failure to Perform)

All Glass's claims are barred, in whole or in part, because All Glass has failed to perform its contractual allegations as outlined in the Counterclaim.

---

[1] Arglass reserves its right to add additional affirmative defenses, particularly as it relates to issues learned through discovery. The pleading of these affirmative defenses is not an admission that Arglass has the burden of proof on any of these issues.

### Third Affirmative Defense (Failure to Cure)

All Glass's claims are barred, in whole or in part, because All Glass has repeatedly failed to cure defaults and breaches as asserted in the Counterclaim.

### Fourth Affirmative Defense (Unclean Hands)

All Glass's claims are barred, in whole or in part, by All Glass's substantial misconduct in relation to the contract between the parties, including its intentional misrepresentations concerning compliance with the terms of the contract as outlined in the Counterclaim.

### Fifth Affirmative Defense (Copyright Misuse)

All Glass's claims are barred, in whole or in part, because All Glass seeks to secure an exclusive right or limited monopoly not granted by the Copyright Office.

### Sixth Affirmative Defense (Licensed Use)

All Glass's claims are barred, in whole or in part, because Arglass acted pursuant to express or implied license.

### Seventh Affirmative Defense (Delayed Registration)

All Glass's demands for damages and attorneys' fees pursuant to Sections 504 and 505 of the Copyright Act are barred, in whole or in part, because All Glass failed to comply with the requirement of timely registration set forth in Section 412 of the Copyright Act, 15 U.S.C. § 412.

### Eighth Affirmative Defense (17 U.S.C. § 117(a))

All Glass's claim of copyright infringement is barred by 17 U.S.C. § 117(a) because Arglass is the owner of a copy of the computer program referred to in the Complaint.

# COUNTERCLAIM

Counterclaim-Plaintiff Arglass Yamamura SE, LLC ("Arglass"), by its undersigned counsel and for its counterclaim against Counterclaim-Defendant All Glass s.r.l, ("All Glass") alleges as follows:

## INTRODUCTION

1. After persistently neglecting to cure its failed performance obligations on the relevant project for years, and repeatedly acknowledging that its products and services have failed to operate as intended, All Glass asks this Court for millions of dollars. Left out of its sparse pleading is even a mention of the default notice Arglass sent months ago to All Glass due to the squalid performance of All Glass's products and services.

2. To date, approximately two years after the All Glass equipment was supposed to be delivered to Arglass and operating, numerous parts simply do not work. These include separators, horizontal straps, partition inserters, camera identifiers, and camera orienteers. Out of three automated guided vehicles ("AGV") that were to be supplied by All Glass to Arglass, one is operational. As a result of these fundamental deficiencies, among other issues, glass product has been shipped without partitions to protect it from shattering, the wrong product has been shipped leading to the customer rejecting entire production lots, and Arglass has been forced to pay personnel to stand on the line and orient bottles correctly because the All Glass-supplied equipment it paid for in order to do that task is incapable of functioning properly.

3. All Glass's contractual breaches and neglect of its customer have left Arglass in an operational and financial lurch, forced to pay millions of dollars to attempt to cure for itself All Glass's inability and unwillingness to perform its contractual obligations, all while incurring millions in lost sales and revenue caused by the dysfunctional equipment installed by All Glass.

The direct costs Arglass has paid to fix the defective system installed by All Glass currently stand at approximately $2 million, plus millions of dollars more in lost revenue and wasted product.

4. Now All Glass accuses its own customer of violating copyright law by maintaining software used to control and operate its own machinery and equipment.

5. All Glass's copyright claim is based on a fundamental misrepresentation in its pleading. The contract is clear: Arglass has rights to use the "software" as necessary to "install, operate, and maintain All Glass's products." Ex. A at 27, § 12.2. Contrary to All Glass's implication, nowhere does the contract state that Arglass may not modify the software. All Glass's view that its own licensee cannot make modifications essential to the continued functioning of the licensed product would hold Arglass's entire production line hostage to All Glass's servicing (or, in this case, lack thereof), makes a mockery of copyright law, and is commercially absurd.

## FACTUAL BACKGROUND

6. Arglass entered into an agreement with All Glass on June 19, 2019, to supply, install, test and commission certain machinery to operate handling and packaging lines, at Arglass's recently completed, state-of-the-art glass container manufacturing plant in Valdosta, Georgia.

7. The Georgia production facility, which was launched and commenced operations in December 2020, overhauled the traditional glass production model to become the most modern and technologically-advanced glass plant in the United States, with a production system based on flexibility, efficiency, and sustainability. Arglass is indirectly owned, in part, by the Japanese company Nihon Yamamura Glass, which has over a century of glass container manufacturing experience.

8. All Glass failed, among other deficiencies, to ensure the performance and availability of the machinery to be supplied, delivered, installed, tested and commissioned by All Glass at Arglass's production facility under the Agreement; to timely commission the machinery; to synchronize the machinery with Arglass's other production equipment; and to perform other contractual obligations. As a result of All Glass's breaches, Arglass has suffered significant damages, including loss of glass production.

9. All Glass has failed to cure its breaches, repeatedly ignored notifications and requests for information from Arglass, and made willful and intentional misrepresentations and omissions regarding its compliance with the Agreement, delays, inadequate technical support and training, improper subcontracting, lack of insurance, failure to deliver a required guarantee, and the missing, non-conforming and defective equipment.

10. Accordingly, Arglass brings this Counterclaim to enforce the agreement, and to recover from All Glass various amounts, including interest and costs, due under the agreement.

## ALL GLASS'S BREACHES

11. Arglass and All Glass entered into an agreement styled as a Commercial Tender Document dated as of June 18, 2019, together with all exhibits, schedules and amendments with respect thereto, (collectively, the "Agreement"). Contract documents are appended at **Exhibit 1.**

12. Pursuant to the Agreement, All Glass agreed to supply, install, test and commission certain specified machinery within agreed upon performance specifications for handling a specific list of articles with the reliability required by a 24x7x365 industrial operation (the "System") at

Arglass's glass container manufacturing plant in Valdosta, Georgia (the "Premises") for use in the operation of the US Container Glass-Project described in the Agreement (the "Project").[2]

**All Glass Failed To Meet The Deadlines Set Forth In The Agreement**

13. Document 01—Milestone Planning sets a due date of November 06, 2020, for the Start of Production, along with multiple other milestone dates. Ex. 1 at 9. All Glass did not even come close to meeting the Start of Production milestone, or numerous other milestones.

14. In fact, on November 6, not even one of the three lines was operational. The first line did not start production until weeks later and major delays and defects continued as discussed more fully below for more than a year, substantially limiting productivity and causing Arglass to expend its own funds to attempt to fix the equipment.

15. Arglass warned All Glass regarding its serious performance failure in October 2020 and sent a notice of default related to this undisputed failure of performance in November 2020, which All Glass conveniently omitted from its Complaint. Numerous other warnings and notices followed in the months thereafter.

16. Finally, a substantial amount of required equipment was not even delivered within six months of when it was supposed to be delivered, including: two film puncturing machines, two bottler separators, automatic inserters, and three horizontal strapping machines. Even after it was delivered, much of this equipment has remained non-operational.

17. Pursuant to Document 05—Commercial Conditions, Sections 9.1-9.2, All Glass is required to pay Arglass liquidated damages each day that the start-up of the System is delayed

---

[2] Unless otherwise defined, all capitalized terms used herein shall have the meanings ascribed to them in the Agreement.

beyond the originally scheduled start-up date set forth in Document 01—Milestone Planning. Ex. 1 at 33.

**All Glass's Products And Services Have Failed To Meet The Performance and Availability Guarantees**

18. Pursuant to Document 05—Commercial Conditions, Section 7.1, All Glass guaranteed that the System "will perform as stated in the Document 02 – Technical Specification of the Agreement" (the "Performance Guarantee") for the agreed list of articles and that this "performance must be sustained over continuous operation period amounting to 24 hours per Business Day." Ex. 1 at 31.

19. Likewise, Pursuant to Document 05—Commercial Conditions, Section 7.2, All Glass "guarantee[d] an annual working time (availability of the System) that amounts to three-shift operations per day for seven days a week" (the "Availability Guarantee"). Ex. 1 at 31-32.

20. The System has frequently and persistently failed to meet the parameters stated in Documents 02 and 05, causing significant losses to Arglass.

21. For example, over the course of just one weekend in late February 2021, months after the system was supposed to be functional, Arglass incurred 23.5 hours of downtime stemming from at least 10 separate faults.

22. Arglass has repeatedly notified All Glass concerning these indisputable contractual breaches and performance failures, including, without limitation, on February 1, 2021 and through formal letter on March 10, 2021. Arglass's Complaint simply ignores its obvious failure to perform its obligations under the contract.

**All Glass Supplied Defective and Non-Rated Equipment**

23. Pursuant to Document 05—Commercial Conditions, Section 2.2, All Glass agreed to provide goods, services and documentation under the Agreement that "conform to the standards

set forth in Document 02—Technical Specification, as well as all US laws, rules and regulations and the most stringent of the international standards and acts engaged or observed or approved by a significant portion of the glass industry for similar facilities and which accomplish the desired result in a manner consistent with the applicable industry standard of reliability, safety, environmental protection, economy and expediency." Ex. 1 at 28.

24. Moreover, Document 07—Scope of Supply lists all equipment to be delivered by All Glass. Ex. 1 at 55. All Glass also warranted *inter alia* that the equipment would meet the standard of merchantability. Ex. 1 at 42.

25. All Glass has failed to abide by these contractual requirements in a multitude of ways. For example, much of the equipment that All Glass has supplied is not UL rated as required under US rules and regulations and the Agreement itself. Likewise, almost every piece of equipment that All Glass has provided fails to adhere to standards set forth in the Agreement and has endured longstanding defects and downtime, particularly the palletizer equipment, container equipment, shrinker, camera separator and allocators, and bagger.

26. To date, the horizontal strappers, partition inserters, separators, camera identifier, and camera orientators are collecting dust because they simply do not (and never did) work, and All Glass has been unable to fix them. These basic failures to deliver the materials purchased under the contract, and to perform core servicing obligations, have led to bottles being shipped without proper protective equipment, additional manual labor costs, and wasted product, among other costs. For instance, the failure of All Glass's bottle separator to identify and separate different types of bottles has caused incorrect product to be shipped to the customer, resulting in the customer rejecting entire production lots.

27. The production lines that All Glass promised have endured additional systemic issues. Most notably, the equipment encounters an immense and irregular number of automated faults that stop production. For instance, over the course of less than one month, a single piece of equipment triggered thousands of faults.

28. The enormous number of faults stems from All Glass delivering non-standard and sub-standard equipment and being incapable of fixing it. For example, Arglass ordered five new palletizers – complex, computer-controlled, and robotic production line equipment – as part of its contract. All Glass delivered five different palletizers apparently assembled by different subcontractors without a set of common technical specifications. The palletizers have each been apparently scrapped together using various different parts – including different versions of their computers. As set up by All Glass, the robotic palletizers collided with each other under normal operations. Since then, each of these five machines have required unique settings in order to operate, increasing the risk of faults, downtime, and maintenance expense substantially.

29. Moreover, All Glass used single-speed motors instead of variable speed motors for much of the machinery. This substandard equipment, combined with poor software, results in glass-handling equipment that violently jerks around, breaking glass and equipment. Arglass has incurred approximately $2 million in direct costs alone to fix these kinds of systemic issues, and yet to this day must troubleshoot – or work around – unsatisfactory equipment performance and non-operational equipment.

30. Arglass has also endured other issues with the All Glass computer and data processing systems used to operate and monitor the production lines' machinery. This includes, without limitation, All Glass's personnel feeding incorrect data into the system and making unannounced modifications to system settings from thousands of miles away, in Italy, that have

caused countless system errors and production shutdowns. When Arglass requested that access to its own system settings be restricted to prevent All Glass and its representatives from erroneously changing system settings remotely, All Glass refused. All Glass has also failed to update documentation necessary for proper labeling of product and has relied on faulty and repurposed data sensors rather than proper equipment.

**Inadequate Technical Support and Training**

31. Pursuant to Document 05—Commercial Conditions, Section 12.2, All Glass must make available remote 24/7 support service to Arglass and send a qualified technician to rectify problems within 3 business days after written notification from Arglass with a description of defects. Ex. 1 at 35.

32. All Glass failed to send a qualified technician to rectify problems within 3 business days after numerous written notifications from Arglass with descriptions of the defects.

33. The on-site and remote technicians that All Glass has made available have failed to rectify the installation and performance problems, as required pursuant to Document 05—Commercial Conditions, Section 12.2. Furthermore, All Glass has refused to change security settings on the Human Machine Interface system to prevent unwanted changes to machinery settings that have impacted production. All Glass has also refused to provide a backup of software used to operate the machinery to ensure redundancy and contingency response capability.

34. Moreover, Document 03—Training Definition, sets forth the minimum requirements to be met by All Glass when carrying out training on the machines and equipment delivered. The Agreement requires three months of training, including advanced training in English, classroom training manuals and on-the-job training on various topics. Ex. 1 at 17-18.

35. All Glass has failed to satisfy the minimum training requirements, including on the grounds that All Glass has failed to provide even basic training in English, has failed to provide classroom training manuals and has failed to provide on-the-job training. For example, All Glass failed to provide or facilitate any training on strapper machinery.

**Improper Subcontracting And Lack Of Insurance**

36. Pursuant to Document 05—Commercial Conditions, Section 5.8, "[r]eassigning services to any third parties is subject to the express prior written approval by the Customer." Ex. 1 at 30.

37. All Glass has assigned the installation and commissioning of the System to third parties without Arglass's express prior written approval.

38. All Glass continued to assign work to subcontractors, even after Arglass repeatedly demanded that it cease using such subcontractors.

39. Work performed by the subcontractors hired by All Glass without the consent of Arglass caused many of the problems described herein, which have caused Arglass to incur significant damages, including loss of glass production. Indeed, virtually all installation activity was subcontracted, as was most of the ineffective equipment servicing work.

40. Additionally, All Glass or its subcontractors, and/or their respective employees, servants, contractors or agents, have caused damage to Arglass's premises. Specifically, a subcontractor without a valid permit drove a forklift into a wall at the facility causing thousands of dollars of damage for which Arglass has not been reimbursed, despite an All Glass employee's representation more than 18 months ago that he is "very sorry for this accident" and claiming that his "people" were "at your disposal to help you fix it . . . ."

41. Pursuant to Document 05 – Commercial Conditions, Section 18.1, All Glass must, at its sole cost and expense, obtain and maintain insurance coverage as described therein and shall provide Arglass with a certificate of insurance for each policy within thirty (30) days of the Effective Date and provide a least thirty (30) days prior written notice to Arglass upon cancellation or any material adverse change in any insurance coverage that All Glass is required to carry under the Agreement. Ex. 1 at 39.

42. Pursuant to Document 09 – Particular Conditions, Section 18.1, during the term of the Agreement, All Glass shall maintain insurance including, "Comprehensive General Liability, including Completed Operations: USD 1 million per occurrence and USD 2 million in the aggregate" and "Excess/Umbrella Liability: USD 10 million including product liability." "Upon written request by Arglass, Supplier shall furnish to Arglass for its examination a Certificate of Insurance evidencing [such] coverages. Supplier shall not cancel, terminate or materially alter such coverages without at least 30 days prior notice to Arglass." Ex. 1 at 69.

43. After numerous written and oral demands, All Glass has failed to provide evidence of compliant insurance coverage.

44. Upon information and belief, All Glass has failed to obtain appropriate insurance coverage in accordance with Document 05 – Commercial Conditions, Section 18.1 and Document 09 – Particular Conditions, Section 18.1.

**Failure To Obtain Guarantee And Submission Of Invalid Documentation**

45. Pursuant to Section 11.1 of the Agreement, Ex. 1 at 67, All Glass was required to obtain and submit to Arglass an "enforceable, indefinite and irrevocable bank guarantee from a financial institution permitted by the European Union" to "ensure the advance deposit" paid by Arglass.

46. When Arglass asked for and received the purported "guarantee," it followed up with an appropriate financial institution to determine whether the guarantee was valid. Arglass discovered that the SWIFT code provided was linked to a bank long out of business and the guarantee paper was not a valid document. When confronted by Arglass, All Glass obfuscated regarding the issue and never provided a valid guarantee in breach of its contract.

**Failure To Cure And Related Misrepresentations And Omissions**

47. Arglass has repeatedly notified All Glass of its breaches and other problems, including those described herein, including in communications in October 2020, February 2021, and March 2021, among many others.

48. Despite failing to be candid with this Court about the poor performance of its products, All Glass has on several occasions acknowledged its defaults, breaches, and failures to perform. Its years-long delay in bringing these very claims is tacit acknowledgment of the ongoing failures of its products and services.

49. Nevertheless, despite numerous notifications and opportunities to cure, All Glass failed to substantially perform in accordance with the Agreement and has failed to cure its breaches and other problems.

50. All Glass has failed to respond to numerous notifications and requests for information from Arglass regarding breaches and other problems, including those described herein. Indeed, many of the breaches, defaults, and obvious equipment defects continue to date.

51. All Glass has made willful and intentional misrepresentations and omissions regarding its compliance with the Agreement, delays, inadequate technical support and training, improper subcontracting, lack of insurance, and the missing, non-conforming and defective equipment.

## COUNT ONE:
### (Breach of the Agreement)

52. Arglass re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 above as if fully repeated and set forth herein.

53. The Agreement is a valid, enforceable and binding contract that was formed and entered into between Arglass Yamamura SE, LLC and All Glass s.r.l.

54. Arglass Yamamura SE, LLC performed in accordance with the Agreement.

55. All Glass s.r.l has failed to perform in accordance with the Agreement.

56. All Glass s.r.l has continually breached its obligations under the Agreement, including but not limited to, through its actions outlined above. This resulted in significant monetary damages to Arglass Yamamura SE, LLC.

57. Due to All Glass s.r.l's breach of the Agreement, Arglass Yamamura SE, LLC is entitled to enforcement of its rights and remedies against All Glass s.r.l under the Agreement at law and in equity, including without limitation, specific performance and monetary relief in an amount to be determined at trial, but which can be no less than $6,000,000.

## CONCLUSION

**WHEREFORE**, Arglass prays for judgment in favor of Arglass and against All Glass as follows:

A. Judgment against All Glass to the extent of its liability under the Agreement;

B. Damages in an amount to be determined at trial, but presently believed to be in excess of $6,000,000;

C. A declaratory judgment finding that All Glass has failed to perform and requiring All Glass to specifically perform its obligations under the Agreement;

D. Prejudgment and post-judgment interest;

E. Attorneys' fees, including pursuant to Section 505 of the Copyright Act, 17 U.S.C. § 505; and

F. Such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
February 22, 2023

**DECHERT LLP**

By: */s/ Gary J. Mennitt*
    Gary J. Mennitt
    Jennifer Insley-Pruitt
    Ryan Strong

    Three Bryant Park
    1095 Avenue of the Americas
    New York, New York 10036
    Tel.: (212) 698-3500
    Fax: (212) 698-3599
    gary.mennitt@dechert.com
    jennifer.insley-pruitt@dechert.com
    ryan.strong@dechert.com

*Attorneys for Defendant-Counterclaim - Plaintiff Arglass Yamamura SE, LLC*